# EXHIBIT A

SCANNED



RECEIVED

JUN 03 2021

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

1  PATRICK M. RYAN (SBN 203215)
     *pryan@bzbm.com*
2  STEPHEN C. STEINBERG (SBN 230656)
     *ssteinberg@bzbm.com*
3  GABRIELLA A. WILKINS (SBN 306173)
     *gwilkins@bzbm.com*
4  BARTKO ZANKEL BUNZEL & MILLER
   A Professional Law Corporation
5  One Embarcadero Center, Suite 800
   San Francisco, California 94111
6  Telephone: (415) 956-1900
   Facsimile:  (415) 956-1152
7
   Attorneys for Plaintiffs CISCO SYSTEMS, INC. and
8  CISCO TECHNOLOGY, INC.

9

10                UNITED STATES DISTRICT COURT

11               NORTHERN DISTRICT OF CALIFORNIA

12

13  CISCO SYSTEMS, INC. and CISCO          Case No.    **C 21 04272**
    TECHNOLOGY, INC.,
14                                         **[PROPOSED]** ORDER GRANTING
           Plaintiffs,                     **PLAINTIFFS CISCO SYSTEMS, INC.
15                                         AND CISCO TECHNOLOGY, INC.'S
        v.                                 EMERGENCY *EX PARTE* MOTION FOR
16                                         TEMPORARY RESTRAINING ORDER,
    WUHAN WOLON COMMUNICATION              ASSET FREEZE ORDER, EXPEDITED
17  TECHNOLOGY CO., LTD. and WUHAN         DISCOVERY, ORDER AUTHORIZING
    WOLON CLOUD NETWORK                    ALTERNATIVE SERVICE OF PROCESS,
18  COMMUNICATION TECHNOLOGY CO.,          AND ORDER TO SHOW CAUSE RE:
    LTD.,                                  PRELIMINARY INJUNCTION**
19
           Defendants.                     **RE: ECF No. 5**
20

21

22

23

24

25

26

27

28

RS

1    Pending before the Court is Plaintiffs Cisco Systems, Inc. and Cisco Technology, Inc.
2 (together, "Cisco" or "Plaintiffs") *ex parte* motion for a temporary restraining order, an order to
3 show cause, an order freezing Defendants Wuhan Wolon Communication Technology Co., Ltd.
4 and Wuhan Wolon Cloud Network Communication Technology Co., Ltd.'s (together, "Wolon")
5 assets, expedited discovery, and an order authorizing alternative service of process by email. The
6 Court has reviewed Cisco's motion papers and [held an *ex parte* hearing on_____/
7 exercised its discretion to enter this ruling without a hearing]. Because Cisco moved *ex parte*,
8 requesting that no notice be provided and said request is granted herein, Wolon was not heard.
9    For the reasons set forth herein, Cisco's motion is GRANTED as further described in this
10 "Order."

11 **I.    BACKGROUND**
12    **A.    Cisco and Its Transceivers**
13    Cisco is the leading designer and manufacturer of transceivers—devices that transmit and
14 receive data—used in public and private networks. *See* 5/24/21 Decl. of First Witness ("Decl.
15 No. 1")[1] ¶¶ 4, 11-13, ECF __. Cisco's customers include the U.S. government and military,
16 healthcare systems and hospitals, Internet Service Providers ("ISPs"), wireless phone carriers, and
17 public transit systems and utilities, among others. *Id.* Cisco's transceivers are a key foundational
18 component of the United States' communications infrastructure. *Id.*

19    Transceivers are electronic devices that transmit and receive data. *See* 5/19/21 Decl. of
20 Second Witness ("Decl. No. 2") ¶ 7, ECF __. A transceiver encodes and decodes data by
21 converting an electrical signal into light pulses and back again, which are sent through a fiber
22 optic cable. *Id.* Transceivers provide the vital connections in networks. *See* Decl. No. 1 ¶ 11,
23
24
_____
25 [1] To avoid revealing the identities of the Cisco personnel conducting the investigation and the
26 consultants participating in the investigation, the names of the declarants are undisclosed herein,
27 and have been replaced with the number of the declaration in order of filing, as the names have
28 been sealed pursuant to an Order entered contemporaneous with this opinion.

[PROPOSED] ORDER GRANTING PLAINTIFFS' *EX PARTE* MOTION FOR TRO

ECF __. The quality and performance of networks in the U.S. and around the world depend on authentic and high-quality Cisco transceivers. *See id.*

Cisco sells a range of transceivers varying in size, functionality, and price. *See* Decl. No. 2 ¶ 7, ECF __. Cisco designs all of its transceivers to meet and exceed industry standards for quality, reliability, safety, and performance, which vary depending on the industry, e.g. there are higher standards for military than commercial applications. *Id.* A variety of U.S. industries, including the government and military, healthcare systems and hospitals, and ISPs and wireless phone carriers, rely on Cisco transceivers to perform critical applications and to ensure the integrity of data transfer and communications. *See* Decl. No. 1 ¶ 22, ECF __.

Cisco owns the following well-established famous and registered trademarks, among others (together, the "CISCO Marks") that appear on genuine Cisco transceivers and other products:

- "CISCO" (U.S. Trademark Reg. Nos. 1,542,339; 2,498,746; 3,709,076; 3,978,294; 3,985,844; 3,990,147; 4,005,670)

- cisco (U.S. Trademark Reg. No. 3,759,451)

*See* Decl. No. 1 ¶¶ 5-10, Ex. 1A, ECF __. Cisco has used, and is currently using, the CISCO Marks continuously and exclusively in commerce, including in connection with its sale of Cisco transceivers, and plans to continue such use in the future. *Id.*

Cisco has invested heavily in the Cisco brand, and prominently displays the CISCO Marks in its advertising materials. *Id.* As a result, the CISCO Marks are widely recognized and well-known to the public, and are known for their quality. *Id.* Cisco has spent, and continues to spend, billions of dollars marketing and promoting in interstate commerce its products in connection with the CISCO Marks. *Id.* Due to Cisco's longtime use of and investment in the CISCO Marks and the quality of Cisco's products, the Cisco brand has built up a tremendous amount of consumer goodwill. *Id.* The CISCO Marks are famous and symbolize this goodwill, and are invaluable assets to Cisco. *Id.*

Authentic Cisco transceivers are manufactured by well-vetted and carefully controlled and monitored third-party vendors called original equipment manufacturers ("OEMs"). *See* Decl. No.

1  2 ¶ 8, ECF __. Each of these OEMs utilizes specialized equipment and heavily tested processes
2  and components to produce consistent, high-performing products on which customers can rely. *Id.*
3        Cisco requires its OEMs to follow strict quality control standards that govern the entire
4  lifecycle of each transceiver, from its design, components, and manufacture to distribution and
5  post-sale support. *Id.* ¶ 9. Each OEM undergoes reliability testing to expose potential defects in
6  the manufacturing process and regular reviews to examine the OEM's practices and procedures
7  and identify areas for improvement. *Id.* Cisco regularly audits each OEM, which must maintain
8  detailed records for each product's movement throughout the supply chain to enable Cisco to
9  monitor each transceiver's distribution and support customers via serial number traceability. *Id.*
10  Cisco uses these controls to safeguard its reputation for quality, safety, and reliability. *Id.*
11        In order to fight counterfeiting, Cisco has a robust brand protection program that takes a
12  multilayered approach to the problem of counterfeiting, which is global in scope and affects the
13  entirety of the network industry. *See* Decl. No. 1 ¶ 3, ECF __. Cisco's strategies include
14  collaborating with law enforcement in various countries where counterfeits are made or sold,
15  including both the U.S. and China. *Id.* Cisco also employs third-party private investigators or
16  consultants to identify and purchase suspected inauthentic Cisco products, online. *Id.*
17        Wolon is a company based in China. As part of Cisco's global anti-counterfeiting efforts,
18  Cisco discovered that Wolon was offering purported Cisco transceivers online to U.S. customers.
19  *See* 5/27/21 Decl. of Third Witness ("Decl. No. 3") ¶¶ 3-4, 6-7, ECF __. Cisco's consultant attests
20  to having purchased purported Cisco transceivers and labels from Wolon, who then shipped the
21  transceivers to this District. *Id.* ¶¶ 7-16. Cisco attests that it analyzed and tested these purported
22  Cisco transceivers and labels and confirmed that they were inauthentic in that they were not made
23  by or associated with Cisco. *See* Decl. No. 2 ¶¶ 3, 14-21.
24        Cisco presented evidence that Wolon's counterfeit transceivers are advertised, offered for
25  sale, and/or sold with product labels with counterfeit CISCO Marks referenced above, and/or are
26  otherwise designed to create the impression that they are authentic Cisco transceivers. Cisco
27  attests that testing also revealed that the transceivers use unapproved, untested, and non-genuine
28  components, and do not meet Cisco's design, build, and inspection standards.

PROPOSED ORDER GRANTING PLAINTIFFS' *EX PARTE* MOTION FOR TRO

**B.    Discovery and Testing of Counterfeit Cisco Transceivers**

Certain details of Cisco's investigation and testing are sealed; thus, this order does not refer to them with specificity.

The success of Cisco's brand has attracted criminal counterfeiters who illegally profit by selling fake Cisco products. To combat this, Cisco investigates suspicious listings in online marketplaces by arranging for a consultant to buy suspect Cisco transceivers from defendants like Wolon. *See* Decl. No. 2 ¶ 14; Decl. No. 3 ¶¶ 3-4, 6, ECF __.

Cisco has labs and engineering investigators who can test potentially counterfeit products, using specialized tools and product data to compare suspect products with authentic products. *See* Decl. No. 2 ¶¶ 12-13, ECF __. Wolon delivered transceivers and labels with the CISCO Marks purchased by Cisco's consultants to an address in this District, and the consultants then shipped such products and labels to Cisco for testing. *Id.* ¶ 15; Decl. No. 3 ¶¶ 6, 17-18, ECF __.

A Cisco expert in product testing, analysis, and authentication, analyzed each transceiver received from Wolon to determine whether it was genuine. *See generally* Decl. No. 2. As set forth below, Cisco's engineering investigator first personally evaluated each product using Cisco's standard techniques for evaluating potential counterfeits, and in each case determined that Wolon's product was, in fact, inauthentic in that it was indisputable  it had not been manufactured by Cisco or by someone associated with Cisco. *Id.* ¶ 15, 19-21. This analysis was set forth in Cisco's engineering investigator's declaration, and it shows that the Cisco transceivers from Wolon are inauthentic. *Id.* The findings are summarized below.

In March 2021, Cisco's consultant ordered 200 units of purported Cisco GLC-LH-SMD transceivers with Cisco labels from Wolon. *See* Decl. No. 3 ¶¶ 8-11, ECF __. Wolon advertised and offered these transceivers as "Cisco Compatible," and to sell them with "cisco label[s], you stick it [on] by yourself," sent pictures of such labels showing the CISCO Marks, and promised that "we can print Cisco label like the picture 100%" that "you stick [on] by yourself." *Id.* In April 2021, Wolon sent the transceivers and labels with the CISCO Marks to Cisco's consultant in this District. *Id.* ¶¶ 14-16. Cisco's consultant then sent the purported Cisco transceivers to Cisco for examination. *See id.* ¶¶ 17-18; Decl. No. 2 ¶¶ 16-17, ECF __.

PROPOSED ORDER GRANTING PLAINTIFFS' *EX PARTE* MOTION FOR TRO

1    On April 19, 2021, Cisco's engineering investigator examined the suspect purported Cisco

2   transceivers and labels received from Wolon. *See* Decl. No. 2 ¶ 18, ECF ___. Each label had the

3   Cisco name and logo. *Id.* Each transceiver also had an internal memory chip that contained data

4   designed to make the product appear to have been made by Cisco. *Id.* ¶ 19. But Cisco's engineer

5   confirmed that the products were clearly inauthentic in that they were not manufactured by Cisco

6   or by someone associated with Cisco in light of the many differences between them and authentic

7   Cisco transceivers. *Id.* ¶¶ 19-21.

8    Based on these findings, Cisco filed a Complaint against Wolon for Trademark

9   Infringement (15 U.S.C. § 1114–1117), Dilution of Mark (15 U.S.C. § 1125), and Unfair

10   Competition (15 U.S.C. § 1125), as well as California law claims for False Advertising (Cal. Bus.

11   & Prof. Code § 17500) and Unfair Competition (Cal. Bus. & Prof. Code § 17200). Cisco moves *ex*

12   *parte* for a temporary restraining order, order to show cause, seizure order, expedited discovery, an

13   order freezing Wolon's assets, and an order authorizing it to serve Wolon by email.

14    For the reasons expressed below, Cisco's motion is GRANTED.

15   **II.    LEGAL STANDARD**

16   **A.    Notice**

17    This Court may issue a TRO without notice to the adverse party if (1) "specific facts in an

18   affidavit or a verified complaint" show that immediate and irreparable injury will occur before the

19   adverse party can be heard and (2) the movant's attorney certifies in writing what efforts were

20   made to give notice and the reasons why notice should not be required. Fed. R. Civ. P. 65(b).

21    The Ninth Circuit recognizes the issuance of an *ex parte* TRO is warranted where notice to

22   the defendant would render further prosecution fruitless, e.g. "[i]n the trademark arena, such cases

23   include situations where an alleged infringer is likely to dispose of the infringing goods before the

24   hearing." *Reno Air Racing Ass'n., Inc. v. McCord*, 452 F.3d 1126, 1131 (9th Cir. 2006). An

25   applicant can justify excusal of the notice requirement on this ground by showing "that the adverse

26   party has a history of disposing of evidence or violating court orders or that persons similar to the

27   adverse party have such a history." *Id.* (quoting *First Tech. Safety Sys., Inc. v. Depinet*, 11 F.3d

28   641, 651 (6th Cir.1993)).

PROPOSED ORDER GRANTING PLAINTIFFS' *EX PARTE* MOTION FOR TRO

The Court finds *Talavera Hair Prod., Inc. v. Taizhou Yunsung Elec. Appliance Co., LTD* (*Talavera*) instructive. No. 18–CV–823–JLS (JLB), 2018 WL 3413866 (S.D. Cal. May 10, 2018). There, the defendants sold their infringing products through online eCommerce marketplaces including Amazon and eBay, and the plaintiff had tried to stop similar sellers, only to see the same goods reappear under new sellers. *Id.* at \*4. *Talavera* also noted nine other cases where TROs were granted against similar online infringers who used eCommerce marketplaces to sell their infringing products. *Id.* Thus, the court found that notice to the defendants would likely result in the disappearance or transfer of the counterfeit products, so notice was not required and the plaintiff could proceed *ex parte*. *Id.*

Similarly, *Gucci Am., Inc. v. Los Altos Boots, Inc.* supports the Court's decision to excuse notice here. No. CV1406680BROAJWX, 2014 WL 12561613 (C.D. Cal. Aug. 27, 2014). There, the court excused the plaintiff from providing notice before issuing a TRO because: 1) the defendant could easily conceal the counterfeit goods and related records given their nature and location outside the U.S.; and 2) similarly situated defendants in trademark infringement cases have a history of ignoring court orders to preserve and instead destroying evidence after *ex parte* TROs and seizure orders were denied. *Id.* at \*3–4.

The Court also notes that it relieved Cisco from giving notice in a case that was substantially similar to the present one. *See Cisco Systems, Inc. v. Shenzhen Usource Technology Co.*, No. 5:20-CV-04773-EJD, 2020 WL 4196273, \*\*4-5 (N.D. Cal., July 20, 2020).

Here, as explained in greater detail below, Cisco has presented substantial evidence that Wolon likewise is willfully advertising and selling transceivers using counterfeit CISCO Marks, largely through third-party eCommerce websites like Alibaba, and are able and likely to dispose of evidence if given advance notice of the present motion. For good cause shown, Cisco is relieved from giving notice to Wolon.

## B. Standard for Issuing TRO

The standard for issuing a TRO is identical to the standard for a preliminary injunction. *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001); *Lockheed Missile & Space Co. v. Hughes Aircraft*, 887 F. Supp. 1320, 1323 (N.D. Cal. 1995). A

1  plaintiff seeking preliminary injunctive relief must establish that: (1) "[it] is likely to succeed on
2  the merits"; (2) "[it] is likely to suffer irreparable harm in the absence of preliminary relief"; (3)
3  "the balance of equities tips in his favor"; and (4) "an injunction is in the public interest." *Winter*
4  *v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 20 (2008). "[I]f a plaintiff can only show that
5  there are serious questions going to the merits—a lesser showing than likelihood of success on the
6  merits—then a preliminary injunction may still issue if the balance of hardships tips *sharply* in the
7  plaintiff's favor, and the other two *Winter* factors are satisfied." *Friends of the Wild Swan v.*
8  *Weber*, 767 F.3d 936, 942 (9th Cir. 2014) (internal quotation marks and citations omitted)
9  (emphasis in original).

10    Preliminary injunctions are routinely granted in cases involving trademark infringement.
11  The principle "that trademark infringement causes irreparable injury and necessitates immediate
12  injunctive relief" is well settled and "is universally recognized in the courts of [the Ninth] circuit."
13  *Steinway & Sons v. Robert Demars & Friends*, 1981 WL 40530, *7 (N.D. Cal. Jan. 28, 1981).

14  **III. DISCUSSION**

15    **A. Temporary Restraining Order**

16    As described above, a court's decision to grant a TRO is governed by four factors:
17  (1) whether the applicant is likely to succeed on the merits of his action; (2) whether the applicant
18  is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of
19  equities tip in the applicant's favor; (4) and that an injunction is in the public interest. The Court
20  discusses each in turn.

21      **1. Likelihood of Success**

22    Cisco asserts federal claims for trademark infringement, counterfeiting, and false
23  designation of origin and advertising under the federal Lanham Act, as well as claims for unfair
24  competition and false advertising under California state law, against Wolon. Cisco has
25  demonstrated a likelihood of success with respect to all its claims.

26      **a. Federal Claims**

27    A plaintiff claiming trademark infringement under the Lanham Act must show that it
28  "owns a valid mark, and thus a protectable interest" and that a defendant's "use of the mark is

1   likely to cause confusion, or to cause mistake, or to deceive." *Lahoti v. VeriCheck, Inc.*, 586 F.3d

2   1190, 1196 (9th Cir. 2009) (internal quotation omitted); *see also* 15 U.S.C. § 1114(1).

3       Cisco has established that it owns federal trademark registrations for the CISCO Marks.

4   Decl. No. 1 ¶¶ 5-10, Ex. 1A, ECF __. Cisco has also shown that Wolon is using those marks in

5   connection with selling counterfeit Cisco transceivers in the U.S.

6       "To determine whether a likelihood of consumer confusion exists," courts in the Ninth

7   Circuit rely "on the eight-factor *Sleekcraft* test, which reviews: (1) the strength of the mark;

8   (2) proximity or relatedness of the goods; (3) similarity of the marks; (4) evidence of actual

9   confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be

10  exercised by the purchaser; (7) the defendant's intent in selecting the mark; and (8) the likelihood

11  of expansion of the product lines." *JL Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098,

12  1106 (9th Cir. 2016) (citing *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir. 1979)),

13  abrogated in part on other grounds by *Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 810

14  (9th Cir. 2003)). "The factors are non-exhaustive and applied flexibly; the *Sleekcraft* factors are

15  not intended to be a rote checklist." *Id.* (internal quotation marks and citation omitted).

16      Proving false designation of origin based on the same or similar trade names or symbols

17  requires the same showing of a likelihood of confusion. *See Accuride Int'l, Inc. v. Accuride Corp.*,

18  871 F.2d 1531, 1534–35 (9th Cir. 1989) ("[T]he same broad standards of protection apply to

19  trademarks and trade names. . . . [L]ikelihood of confusion is unquestionably the key to a finding

20  of infringement in either case."); *see also* 15 U.S.C. § 1125(a)(1); *Brookfield Commc'ns, Inc. v. W.*

21  *Coast Entm't Corp.*, 174 F.3d 1036, 1047 n. 8 (9th Cir. 1999) (noting that while Lanham Act § 32

22  of the (15 U.S.C. § 1114) protects registered marks, § 43(a) (15 U.S.C. § 1125(a)) also protects

23  against infringement of unregistered marks and trade dress and against a wider range of practices

24  such as false advertising, but "the analysis under the two provisions is oftentimes identical").

25      The Ninth Circuit has held that the *Sleekcraft* test is appropriate to determine likelihood of

26  confusion regarding a claim for false designation of origin. *Accuride Int'l, Inc.*, 871 F.2d at 1536.

27  But courts in this district and around the Ninth Circuit hold that in cases involving counterfeiting,

28  "it is unnecessary to perform the eight-factor evaluation because counterfeit marks are inherently

1  confusing." *Ubiquiti Networks, Inc. v. Kozumi USA Corp.*, No. C 12-2582 CW, 2012 WL

2  2343670, at *14 (N.D. Cal. June 20, 2012) (granting TRO and OSC re preliminary injunction)

3  (citing *Phillip Morris USA Inc. v. Shalabi*, 352 F.Supp.2d 1067, 1073 (C.D. Cal. 2004)); *Microsoft*

4  *Corp. v. Buy More, Inc.*, 136 F. Supp. 3d 1148, 1157 (C.D. Cal. 2015), *aff'd*, 703 F. App'x 476

5  (9th Cir. 2017) (quoting *Phillip Morris*, 352 F.Supp.2d at 1073); *Daimler AG v. A-Z Wheels LLC*,

6  334 F. Supp. 3d 1087, 1096 (S.D. Cal. 2018) (citing *Phillip Morris*, 352 F.Supp.2d 1067 at 1073).

7    A counterfeit mark is: "(1) a non-genuine mark identical to the registered, genuine mark of

8  another, where (2) the genuine mark was registered for use on the same goods to which the

9  infringer applied the mark." *Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc.*, 658 F.3d 936, 946

10  (9th Cir. 2011) (citing *Idaho Potato Comm'n v. G & T Terminal Packaging, Inc.*, 425 F.3d 708,

11  721 (9th Cir. 2005)). As Cisco has shown that this is a clear case of counterfeiting, including the

12  use of identical marks in connection with, supposedly, the same goods, there is a likelihood of

13  confusion as a matter of law.

14    Cisco also meets the standard under *Sleekcraft* to show a likelihood of confusion. Cisco

15  has used its trade name and the CISCO Marks since 1984, in connection with networking products

16  including transceivers, so the marks are strong (*Sleekcraft* factor 1). Decl. No. 1 ¶ 4-6, ECF __.

17  Wolon is selling the same kinds of products as Cisco—transceivers (factor 2)—and using identical

18  marks and trade names (factor 3). And the use of identical marks and trade names to sell

19  counterfeit products shows that Wolon intends to copy them and confuse the public (factor 7).

20  This establishes that Cisco is likely to succeed on the merits of its federal trademark infringement,

21  false designation of origin, and unfair competition claims.

22    Therefore, Cisco has shown that it is likely to succeed on the merits of its federal

23  trademark infringement, false designation of origin, and unfair competition claims.

24        **b.**   **State Law Claims**

25    Cisco has also demonstrated a probability of success with respect to its state law claims for

26  unfair competition and false advertising. The Ninth Circuit "has consistently held" that these

27  claims "are 'substantially congruent' to claims made under the Lanham Act." *Cleary v. News*

28  *Corp.*, 30 F.3d 1255, 1262–63 (9th Cir. 1994). "An action for unfair competition under Cal. Bus.

PROPOSED ORDER GRANTING PLAINTIFFS' *EX PARTE* MOTION FOR TRO

1 & Prof. Code §§ 17200 et seq. is substantially congruent to a trademark infringement claim under
2 the Lanham Act. . . . Under both, the ultimate test is whether the public is likely to be deceived or
3 confused by the similarity of the marks." *Acad. of Motion Picture Arts & Scis. v. Creative House*
4 *Promotions, Inc.*, 944 F.2d 1446, 1457 (9th Cir. 1991) (internal quotation marks omitted).

5       Similarly, where plaintiffs establish that they are likely to succeed on the merits of federal
6 Lanham Act claims, then they also demonstrate a likelihood of success on parallel false
7 advertising claims under California law. *United Tactical Sys., LLC v. Real Action Paintball, Inc.*,
8 No. 14-CV-04050-MEJ, 2014 WL 6788310, at *16–17 (N.D. Cal. Dec. 2, 2014) (finding showing
9 of likelihood of success under Lanham Act sufficient to meet burden for unfair competition under
10 Section 17200 and false advertising under Section 17500).

11       As Cisco has shown it is likely to succeed on the merits of its federal claims, Cisco has
12 also shown it is likely to succeed on its parallel claims for unfair competition and false advertising
13 under California law.

14       **2.   Irreparable Harm**

15       The recently enacted Trademark Modernization Act of 2020 modified 15 U.S.C. § 1116(a)
16 to state that a plaintiff seeking an injunction against trademark infringement "shall be entitled to a
17 rebuttable presumption of irreparable harm … upon a finding of likelihood of success on the
18 merits for a violation identified in this subsection in the case of a motion for a preliminary
19 injunction or temporary restraining order." Pub. L. 116-260; *Vineyard House, LLC v.*
20 *Constellation Brands U.S. Operations, Inc.*, No. 4:19-CV-01424-YGR, 2021 WL 254448, at *14,
21 n. 16 (N.D. Cal. Jan. 26, 2021). Even before the recent change in the law to presume irreparable
22 harm, the Ninth Circuit recognized that "intangible injuries," including loss of goodwill, can
23 constitute irreparable harm. *Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*, 944
24 F.2d 597, 603 (9th Cir. 1991). More specifically, the sale of counterfeited products may cause
25 irreparable harm because such sale may "prevent [Plaintiff] from controlling the reputation of its
26 highly recognizable" brands. *CytoSport, Inc. v. Vital Pharm., Inc.*, 617 F. Supp. 2d 1051, 1081
27 (E.D. Cal. 2009) *aff'd*, 348 F. App'x 288 (9th Cir. 2009).

28

1        Here, Cisco has demonstrated that it spent decades investing in and building the goodwill

2  in its brand and reputation for designing, making, and selling high quality products. *See* Decl. No.

3  1 ¶¶ 4-10, ECF __. Wolon's sales of counterfeit Cisco transceivers mislead customers, and they

4  threaten irreparable harm to Cisco's goodwill that cannot be adequately addressed by awarding

5  damages after-the-fact. This is particularly true as Wolon's counterfeit products were not subject

6  to the same rigorous quality control measures and safety testing, and appear to be inferior to

7  genuine Cisco transceivers. *See* Decl. No. 2 ¶¶ 7-9, 20, ECF __. Thus, temporary and preliminary

8  injunctive relief are appropriate to prevent further irreparable harm to, and ensure that Cisco can

9  regain and maintain control over, its reputation and goodwill.

10          **3.**    **Balance of Equities**

11        "Courts must balance the competing claims of injury and must consider the effect on each

12  party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 7, 24 (2008).

13  "[C]ourts will not shy away from issuing" preliminary injunctive relief "where to do so would be

14  to aid a second comer who has sought to trade upon the efforts and good will of the first comer."

15  *Helene Curtis Indus., Inc. v. Church & Dwight Co.*, 560 F.2d 1325, 1333 (7th Cir. 1977). Here,

16  the balance of equities tips strongly in favor of the issuance of injunctive relief.

17        A TRO or preliminary injunction will impose no legally cognizable hardship on Wolon.

18  "Where the only hardship that the defendant will suffer is lost profits from an activity which has

19  been shown likely to be infringing, such an argument in defense 'merits little equitable

20  consideration.'" *Sream*, 2019 WL 2180224, at \*10 (quoting *Triad Sys. Corp. v. Se. Exp. Co.*, 64

21  F.3d 1330, 1338 (9th Cir. 1995) (superseded on other grounds)); *see also, United Tactical Sys.*,

22  2014 WL 6788310 at \*23 (disregarding claimed hardship from loss of infringing sales).

23        Wolon has no right to sell counterfeit Cisco transceivers or use the CISCO Marks.

24  Therefore, any claimed hardship of its being barred from doing so must be disregarded. At the

25  same time, every sale of a counterfeit transceiver by Wolon is a lost sale for Cisco that detracts

26  from the value of its trademarks and goodwill and risks serious and irreparable harm to its

27  reputation (not to mention the public) by being inferior products. Accordingly, the balance of

28  equities supports issuing a TRO and preliminary injunction in this case.

1    ### 4.    Public Interest

2        Public policy favors granting an injunction when there is a likelihood of consumer

3    confusion. *See Playboy Enterprises, Inc. v. Baccarat Clothing Co.*, 692 F.2d 1272, 1275 (9th Cir.

4    1982) ("In addition to the harm caused the trademark owner, the consuming public is equally

5    injured by an inadequate judicial response to trademark infringement.").

6        In this case public policy favors injunctive relief even more than the usual counterfeiting

7    case because Cisco has offered substantial evidence that Wolon's conduct poses a threat to health

8    and safety. Counterfeits use untested and unapproved components and manufacturing processes,

9    and as such they may not function properly or in combination with authentic Cisco products and

10   components. Decl. No. 2 ¶ 20, ECF __; Decl. No. 1 ¶¶ 15–16, 19–22, ECF __. Nor are they

11   updated with the latest Cisco software, which exposes users to security and intrusion

12   vulnerabilities. *Id.* Data integrity is critical to Cisco's customers, and they need to reliably and

13   securely transmit and receive sensitive data. *Id.*

14       The risk posed by counterfeit transceivers also includes physical harm. Decl. No. 1 ¶¶ 22-

15   23. Cisco transceivers use transmitter laser technologies, which require extensive eye safety

16   testing and manufacturing calibration to ensure users' physical safety. *Id.* Counterfeit transceivers

17   are unlikely to be subjected to this testing or meet these standards. *Id.* A poorly designed

18   transceiver, such as the counterfeits sold by Wolon, can emit excessive electromagnetic energy

19   that interferes with adjacent equipment, which could be detrimental in a sensitive environment,

20   e.g. a military facility or a hospital. *Id.*

21       Counterfeit transceivers put lives in jeopardy. In a criminal action against a counterfeiter of

22   Cisco networking hardware, *U.S. v. Ehab Ashoor*, No. H-09-CR-307 (S.D. Tex. 2010), U.S.

23   Marines Staff Sergeant Lee Chieffalo testified that "[t]he Marine Corps' network infrastructure is

24   solely Cisco equipment," and "the equipment that Cisco uses has proprietary protocols and

25   software on them that operates only with other Cisco gear" that is "built to specifications that [the

26   Marine Corps] use[s] for reliability and environmental hardness." Decl. No. 1 ¶ 13 & Ex. 1B, ECF

27   __. He testified that the use of substandard counterfeit Cisco products presented the risk that

28   "Marines could die." *Id.*

1 The above facts clearly demonstrate that the public interest favors injunctive relief.

2 Accordingly, Cisco's request for a TRO directed to Wolon's conduct is GRANTED.

### B. Asset Freeze

4 Cisco seeks another *ex parte* TRO freezing Wolon's assets to preserve the possibility of

5 equitable relief, including an accounting and return of its ill-gotten gains from counterfeiting. Such

6 assets include, but are not limited to, accounts at China Construction Bank and CITIBANK N.A.

7 to which payments from Cisco's investigator were made. *See* Decl. No. 3 ¶¶ 11-12.

8 The Ninth Circuit holds that when a plaintiff seeks equitable remedies under the Lanham

9 Act, including recovery of a defendant's profits under 15 U.S.C. § 1117, a district court has

10 "inherent equitable power to issue provisional remedies ancillary to its authority to provide final

11 equitable relief." *Reebok Int'l, Ltd. v. Marnatech Enterprises, Inc.*, 970 F.2d 552, 559 (9th Cir.

12 1992). This includes "the power to issue a preliminary injunction in order to prevent a defendant

13 from dissipating assets in order to preserve the possibility of equitable remedies." *Id.* (quoting

14 *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1364 (9th Cir.1988) (*en banc*)). The Ninth

15 Circuit explained "it is essential that the trial courts carefully fashion remedies which will take all

16 the economic incentive out of trademark infringement," and affirmed the district court's granting

17 of TROs and preliminary injunctions to freeze the defendants' assets, in addition to preventing

18 various counterfeiting-related activities. *Id.* at 560 (quoting *Playboy Enters.*, 692 F.2d at 1275).

19 "A party seeking an asset freeze must show a likelihood of dissipation of the claimed

20 assets, or other inability to recover monetary damages, if relief is not granted." *Johnson v.*

21 *Couturier*, 572 F.3d 1067, 1085 (9th Cir. 2009). Given the deceitful and secretive nature of

22 counterfeiting, this Court and others in this Circuit routinely find that dissipation of assets is likely

23 and grant asset freezes in such cases, particularly when defendants are overseas where they can

24 hide assets from a potential judgment. *See Cisco Sys.*, 2020 WL 4196273, at **9-10; *Reebok Int'l*

25 *Ltd. v. Marnatech Enterprises, Inc.*, 737 F. Supp. 1521, 1527 (S.D. Cal. 1989), *aff'd* 970 F.2d at

26 563 ("[d]ue to the international aspect of the defendants' business, the Court is concerned that

27 unless the assets are frozen, defendants may hide their allegedly ill-gotten funds"); *see also, FTC*

28 *v. Affordable Media*, 179 F.3d 1228, 1236–37 (9th Cir. 1999) (finding dissipation likely based on

2790.000/1627314.1                                    13                          Case No. 21-mc-80135-LHK

PROPOSED ORDER GRANTING PLAINTIFFS' *EX PARTE* MOTION FOR TRO

1   defendants keeping funds in the Cook Islands); *Chanel, Inc. v. Sunus Online Group, LLC*, 2014

2   WL 12558780, at \*3 (C.D. Cal. Jan. 15, 2014) ("based on Defendants' blatant violations of

3   trademark laws there is likelihood that Defendants would transfer or hide the illegally obtained

4   assets in order to avoid a judgment in this action," and thus, granted a preliminary injunction

5   freezing their assets). Other Circuits agree that asset freezes are warranted to preserve assets in

6   counterfeiting cases, particularly overseas and/or online. *See, e.g., Levi Strauss & Co. v. Sunrise*

7   *Int'l Trading Inc.*, 51 F.3d 982, 987–88 (11th Cir. 1995) (affirming preliminary injunction

8   freezing assets of U.S.-based defendants who arranged for making counterfeit Levi's jeans in

9   China for sale in Europe); *Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 132–33 (2d Cir. 2014)

10   (confirming trial authority to issue TRO and preliminary injunction freezing assets of defendants

11   selling counterfeit goods online); *Animale Grp. Inc. v. Sunny's Perfume Inc.*, 256 F. App'x 707,

12   709 (5th Cir. 2007) (affirming TRO and preliminary injunction freezing assets of defendants

13   selling counterfeits).

14       Cisco seeks recovery of Wolon's profits from its wrongful use of the CISCO Marks in

15   connection with sales of transceivers, among other relief, so the Court is authorized to freeze

16   Wolon's assets under *Reebok*, 970 F.2d at 559. *See* Compl. at Prayer for Relief ¶¶ J-K, ECF __.

17   The present action involves unauthorized use of the CISCO Marks by Wolon, in its advertising for

18   and offers to sell transceivers and on labels for the transceivers themselves, and Wolon is based in

19   China and uses third-party eCommerce online platforms like Alibaba to market and sell its non-

20   genuine Cisco products into the U.S. Decl. No. 3 ¶¶ 4, 6-19, Ex. A, ECF __. It is not only likely

21   that Wolon can and will dissipate its assets during the pendency of this case if given the

22   opportunity to do so, but it is also difficult if not impossible to enforce U.S. judgments in China.

23   *See, e.g.,* https://travel.state.gov/content/travel/en/legal/travel-legal-considerations/internl-judicial-

24   asst/Enforcement-of-Judges.html (noting no treaty or convention provides for reciprocal

25   recognition and enforcement of judgments); *Yee v. NIVS Intellimedia Tech. Group, Inc.*, No. CV

26   11-8472 JGB (AJWx), 2013 WL 1276024, \*5 (C.D. Cal. March 25, 2013) (stating that Chinese

27   company whose executives are Chinese residents "bore no real risk of sanctions" given the

28   difficulty of enforcing a U.S. judgment against a Chinese national); *Redwen v. Sino Clean Energy,*

1     *Inc.*, No. CV 11-3936 PA (SSx), 2013 WL 12303367, at *5–6 (C.D. Cal. Jul. 9, 2013) (finding

2     that the plaintiff "would face significant obstacles in enforcing any judgment against the

3     defendants' assets in China"); *Gucci America, Inc. v. Wang Huoqing*, No. CV, 2011 WL 31191, at

4     *16 (N.D. Cal. Jan. 3, 2011) (noting that enforcing a judgment may be difficult in China, and

5     compelling transfer of counterfeiter's domain names to plaintiffs).

6         The Court's authority is not limited to freezing specific identified assets, nor to assets

7     within this District or the U.S., and can extend to banks and other non-parties that have custody of

8     Wolon's assets or provide payment services to Wolon. *See Reebok*, 737 F. Supp. at 1527–28 (TRO

9     and preliminary injunction that "any banks, savings and loan associations, or other financial

10    institutions . . . who receive actual notice of this order by personal service or otherwise, are

11    preliminarily enjoined from transferring, disposing of, or secreting any money, stocks or other

12    assets of these defendants, until further order of the court" except in limited circumstances); *Gucci*

13    *Am., Inc.*, 768 F.3d at 133 (rejecting argument that plaintiff had to identify particular property

14    derived from counterfeiting before obtaining TRO and preliminary injunction freezing all assets).

15        Accordingly, Cisco's request for an Order freezing Wolon's assets, including but not

16    limited to Wolon's accounts at China Construction Bank and CITIBANK N.A., is GRANTED.

17       **C.**     **Seizure and Freezing of Wolon's Domain Names and Seller Identifications**

18           **1.**     **Freezing Wolon's Domain Names and Seller Identifications**

19        The Counterfeiting Act of 1984 permits the Court to issue an *ex parte* order for the seizure

20    of goods and counterfeit marks. 15 U.S.C. § 1116(d)(1)(A). This Court and others in this Circuit

21    recognize, in cases involving online counterfeiters, this seizure power authorizes orders freezing

22    counterfeiters' domain names and seller identifications used on eCommerce websites. *See, e.g.,*

23    *Cisco Sys.*, 2020 WL 4196273, at **10-11; *Williams-Sonoma, Inc. v. Friendfinder, Inc.*, No. C06-

24    6572JSW (MEJ), 2007 WL 4973848, at *10 (N.D. Cal. Dec. 6, 2007), *report and recommendation*

25    *adopted as modified sub nom. Williams-Sonoma, Inc. v. Online Mktg. Servs., Ltd.*, No. C 06-06572

26    JSW, 2008 WL 596251 (N.D. Cal. Mar. 4, 2008) (granting order temporarily barring sale or

27    transfer of defendants' domain names); *Spy Optic Inc. v. Individuals, Partnerships &*

28    *Unincorporated Ass'ns Identified on Schedule A*, No. CV 17-7649 DSF (KSX), 2017 WL

1 10592133, at *2–3 (C.D. Cal. Nov. 27, 2017) (granting preliminary injunction barring transfer of

2 defendants' "Internet based e-commerce store businesses under their seller IDs").

3      The Lanham Act also expressly provides that in certain cases of online trademark

4 infringement, domain name registrars, who control the transfer of domain names, must deposit

5 domain name certificates with the court. *See* 15 U.S.C.§ 1114(2)(D); 15 U.S.C.§ 1125(d)(2).

6      Such relief is necessary because counterfeiters operating online can, and often will, as soon

7 as they receive notice of litigation, take steps to conceal their activities and move their illegal

8 businesses to other online channels to thwart plaintiffs' ability to obtain and courts' ability to

9 award meaningful relief, e.g., modifying domain name registrations; redirecting visitors to new

10 seller identifications or domain names; and/or transferring ownership of seller identifications and

11 domain names. *See* Decl. No. 1 ¶ 24, ECF __.

12      Here, Cisco has adduced substantial evidence that Wolon sells counterfeit Cisco

13 transceivers through stores on third-party eCommerce marketplaces such as Alibaba ("eCommerce

14 Websites"), using its respective seller identifications on those websites, and through its own

15 website domain at www.wolonte.com ("Domain Names"). Decl. No. 3 ¶¶ 7, 13, Ex. A, ECF __.

16      Moreover, an order barring Wolon from transferring its seller identifications, as well as its

17 separate commercial website maintained by Wolon itself ("Domain Names"), requiring transfer of

18 control of such domain names to a U.S.-based registrar of Cisco's choice (while legal ownership

19 remains with Wolon), and requiring deposit of domain name certificates with the Court, would

20 impose no real burden on Wolon. At the same time, it would ensure that ownership of the domain

21 names cannot be changed until this action is resolved on the merits, thereby maintaining the

22 potential for Cisco to obtain full relief. Accordingly, Cisco's request for this relief is GRANTED.

23        **2.**    **Redirection of Wolon's Domain Names to U.S.-Based Registrar**

24      Cisco also seeks to have Wolon's Domain Names automatically redirect to a website that

25 provides notice of and access to filings in this action or, alternatively, disable such websites. Such

26 preliminary relief has been granted in cases involving online counterfeiters. *See, e.g., Cisco Sys.*,

27 2020 WL 4196273, at *11; *Chanel*, 2011 WL 6955734, at *5–6 (granting preliminary injunction

28 directing registrar to redirect domain names to webpage with copy of documents from the action);

PROPOSED ORDER GRANTING PLAINTIFFS' *EX PARTE* MOTION FOR TRO

1    *Asmodus, Inc. v. Junbiao Ou*, No. EDCV162511JGBDTBX, 2017 WL 2954360, at \*5–6, 19 (C.D.

2    Cal. May 12, 2017) (granting preliminary injunction ordering defendant to post notice of the order

3    on its websites, including that they had no affiliation with plaintiff trademark holder and could not

4    sell products with plaintiff's marks); *Otter Prod., LLC v. Anke Grp. Indus. Ltd.*, No. 2:13-CV-

5    00029-MMD, 2013 WL 5910882, at \*4 (D. Nev. Jan. 8, 2013) (granting TRO ordering any web

6    hosting company, domain name registry, and/or domain name registrar getting notice to remove

7    counterfeit and infringing products from defendant's website or alternatively to disable access to

8    the website).

9         Redirecting Wolon's domain names would help prevent further infringement while this

10    case proceeds, as Wolon could not advertise and sell counterfeit Cisco transceivers and labels

11    through those channels. Redirecting those domain names to notice of and filings from this case

12    would also ensure that Wolon receives prompt notice of this case and the relief sought by Cisco,

13    as they would see it upon visiting their own websites. Moreover, Wolon cannot complain about

14    the potential impact of such relief, as the primary hardship would be lost profits from infringing

15    activities. Accordingly, Cisco's request for this relief is GRANTED.

16        **D.**    **Expedited Discovery**

17         The Counterfeiting Act authorizes expedited discovery in connection with seizure orders.

18    *See* 15 U.S.C. § 1116(d)(10)(B) (permitting the Court to modify time limits for discovery in

19    connection with a seizure order). Expedited discovery may be granted for good cause "where the

20    need for expedited discovery, in consideration of the administration of justice, outweighs the

21    prejudice to the responding party," and "good cause is frequently found in cases involving claims

22    of infringement and unfair competition." *Semitool, Inc. v. Tokyo Electron Am., Inc.*, 208 F.R.D.

23    273, 276 (N.D. Cal. 2002). Such good cause is shown "where a well-known trademark . . . has

24    been counterfeited and the sources or purchasers of the counterfeit products are unknown to

25    plaintiff." *Fimab-Finanziaria Maglificio Biellese Fratelli Fila S.p.A. v. Kitchen*, 548 F. Supp. 248,

26    250 (S.D. Fla. 1982).

27         Courts in the Ninth Circuit routinely find good cause for expedited discovery to enable

28    plaintiffs in counterfeiting cases to identify: 1) accounts used for and transactions associated with

1  infringing sales; 2) original sources of and pending shipments of counterfeit products; and 3) other

2  parties involved in counterfeiting activities. *See Cisco Sys.*, 2020 WL 4196273, at **11-12; *Spy*

3  *Optic*, 2017 WL 10592133, at *2 (ordering eBay and PayPal to identify all funds transmitted to

4  defendants' accounts and to provide plaintiffs with data and accounting of all funds, accounts, and

5  transactions); *SATA GmbH & Co. Kg v. Wenzhou New Century Int'l, Ltd.*, No. CV 15-08157-BRO

6  (EX), 2015 WL 6680807, at *11 (C.D. Cal. Oct. 19, 2015) (granting expedited discovery to enable

7  plaintiff to ascertain sources of the counterfeit products and learn of any pending shipments of

8  such products); *Sas v. Sawabeh Info. Servs. Co.*, No. CV1104147GAFMANX, 2011 WL

9  13130013, at *6–7 (C.D. Cal. May 17, 2011) (granting expedited discovery to gather evidence for

10  preliminary injunction to stop infringement, identify others involved in counterfeiting, and prevent

11  destruction of evidence).

12       In the present case, Cisco seeks three types of expedited discovery. First, to identify other

13  parties from whom Wolon bought or to whom it sold counterfeit Cisco transceivers, Cisco seeks

14  from Wolon documents showing the names, addresses, and other contact information of all

15  individuals and entities that Wolon bought Cisco transceivers from and/or sold them to, along with

16  quantities and prices of all such purchases and sales.

17       Second, Cisco seeks from any third party providing services to Wolon, e.g., any

18  eCommerce Website, search engine, Common Carrier, or financial institution or service (including

19  but not limited to those financial institutions identified above—China Construction Bank and

20  CITIBANK N.A.), documents concerning: 1) contact information of Wolon and all entities and

21  individuals associated or acting in concert therewith; 2) any accounts owned or controlled by

22  Wolon and all entities and individuals associated or acting in concert therewith; and 3) Wolon's

23  operations, payment methods, transportation, and listing history concerning Cisco-marked

24  products and/or products advertised using the CISCO Marks. Discovery of these entities and

25  individuals and their accounts and services is necessary to ensure that Wolon's unlawful activities

26  will be contained and that Cisco can promptly identify the full scope of infringing activities

27  connected to Wolon.

28

1    Lastly, Cisco seeks disclosure of the true identities and contact information of the owners

2 of the identified seller identifications and website domain, to the extent they may be concealed by

3 privacy protections on the eCommerce Websites or with the domain name registrars.

4    As in the above-cited cases, there is good cause for such expedited discovery as Cisco has

5 demonstrated that it needs it for the Court's consideration of a preliminary injunction, and to

6 ensure that Cisco can identify the full scope of infringing activities and immediately halt the

7 manufacture and distribution of inferior counterfeit products and resulting irreparable harm while

8 this case is pending. Cisco has also demonstrated that it needs expedited discovery in order to

9 identify potential sources for equitable relief. Moreover, given the Court's prior finding of the

10 likelihood that Defendants may destroy or hide evidence, expedited discovery is appropriate, and

11 Cisco may be prejudiced without it. Accordingly, Cisco's motion for expedited discovery is

12 GRANTED.

13    **E.    Security**

14    "The district court is afforded wide discretion in setting the amount of the bond, . . . and

15 the bond amount may be zero if there is no evidence the party will suffer damages from the

16 injunction." *Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 882 (9th

17 Cir. 2003) (internal citations omitted); *see also, Align Tech., Inc. v. Strauss Diamond Instruments,*

18 *Inc.*, No. 18-CV-06663-TSH, 2019 WL 1586776, at *17 (N.D. Cal. Apr. 12, 2019) ("The district

19 court may dispense with the filing of a bond when it concludes there is no realistic likelihood of

20 harm to the defendant from enjoining his or her conduct."); *Cuviello v. City of Oakland*, No. C 06-

21 05517 MHP EMC, 2007 WL 2349325, at *8 (N.D. Cal. Aug. 15, 2007) (recommending no bond

22 be required in part because there was no proof of likelihood of harm to the party enjoined).

23    Because of the clear evidence of Wolon's counterfeiting, infringement, and unfair

24 competition, the Court finds it appropriate to issue the TRO without requiring Cisco to provide

25 security.

26    **F.    Duration of TRO**

27    The TRO will expire "at the time after entry—not to exceed 14 days—that the court sets,

28 unless before that time the court, for good cause, extends it for a like period or the adverse party

consents to a longer extension." Fed. R. Civ. P. 65(b)(2). "The reasons for an extension must be entered in the record." *Id.* Because service of Wolon is complicated by the fact that it is located in China, Cisco has requested leave to effect service by email. Cisco has also requested to seal the case temporarily during which time it can serve third parties with this Order before the case is made public to ensure that assets and discovery are preserved. As discussed below, the Court finds the request regarding email service to be well-taken and will grant Cisco's request. And as discussed in a concurrently filed order, the Court will also grant Cisco's request to seal the case temporarily. The Court therefore finds good cause to extend the TRO to **July 1, 2021.**

The Court hereby sets a hearing on the Order to Show Cause regarding a Preliminary Injunction for **July 1, 2021** at 9:00 a.m. At the hearing, Wolon must show cause why a preliminary injunction should not issue.

### G.    Alternative Service of Process

Cisco requests an order authorizing it to serve Wolon by email. For defendants located in foreign countries, courts are permitted to authorize service of process "by other means not prohibited by international agreement." Fed. R. of Civ. Proc. 4(f)(3). The only requirements under Rule 4(f)(3) are that service be directed by the court and not prohibited by international agreement. *Rio Properties, Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1015 (9th Cir. 2002). "[C]ourt-directed service under Rule 4(f)(3) is as favored as service available under Rules [4(f)(1–2)]" and does not require first attempting other means. *Id.*

To comport with due process, courts simply need to evaluate whether a service method is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Id.* at 1016 (quoting *Mullane v. Cent. Hanover Bank & Trust Co.,* 339 U.S. 306, 314 (1950)). In *Rio*, the Ninth Circuit agreed that service by email was appropriate, particularly where the defendant conducted its business by email. *Id.* at 1017–18.

As a threshold matter, service by email on defendants in China is not barred by any international agreement. *Microsoft Corp. v. Goldah.com Network Tech. Co.*, No. 17-CV-02896-LHK, 2017 WL 4536417, at *4 (N.D. Cal. Oct. 11, 2017). Courts in this district have authorized

PROPOSED ORDER GRANTING PLAINTIFFS' *EX PARTE* MOTION FOR TRO

1   email service and found that it is reasonably calculated to provide notice to foreign defendants,

2   including defendants based in China, where receipt is confirmed, the email addresses were

3   previously used to communicate with the plaintiffs, or the defendants operate online and use email

4   for their businesses. *Microsoft Corp.*, 2017 WL 4536417 at *5–6 (affirming that email service on

5   defendants in China was sufficient where receipt confirmed); *Carson v. Griffin*, No. 13-CV-0520

6   KAW, 2013 WL 2403601, at *1–2 (N.D. Cal. May 31, 2013) (authorizing service by email where

7   the plaintiff previously corresponded with the defendants via email); *Jenkins v. Pooke*, No. C 07-

8   03112 JSW, 2009 WL 412987, at *2–3 (N.D. Cal. Feb. 17, 2009) (same); *Facebook, Inc. v.*

9   *Banana Ads, LLC*, No. C-11-3619 YGR, 2012 WL 1038752, at *1–2 (N.D. Cal. Mar. 27, 2012)

10   (authorizing email service, including in Hong Kong, where defendants operated online and relied

11   on email communications for their businesses); *Cisco Sys.*, 2020 WL 4196273, at **13-14.

12       In the present case, Wolon is based in China and operates Internet-based businesses

13   trafficking in counterfeit Cisco products. It provides email addresses for communication, and

14   ultimately negotiated and consummated transactions for sale of the infringing products obtained

15   by Cisco's investigator via electronic messaging and email. *See* Decl. No. 3 ¶¶ 13, ECF ___. Email

16   service is appropriate and important in the present case because of the urgency in shutting down

17   sales of inferior transceivers that threaten Cisco's reputation and the integrity of critical U.S.

18   infrastructure that relies on such products.

19       The Court therefore GRANTS Cisco's request for leave to effect service of the Summons

20   and Complaint in this action via email to Wolon at the email address it used to communicate with

21   Cisco's investigator.

22   **IV.    ORDER**

23       **A.    Temporary Restraining Order**

24       Pending further order of this Court, Wolon and its owners, principals, agents, officers,

25   directors, members, servants, employees, successors, assigns, and all other persons in concert and

26   participation with them (collectively, the "Restrained Parties") shall be immediately temporarily

27   restrained from:

28

1.  Purchasing, selling, distributing, marketing, manufacturing, or otherwise using any of the CISCO Marks (as defined above), whether counterfeit or authentic, or any marks confusingly similar thereto in connection with the manufacture, sale, offer for sale, distribution, advertisement, or any other use of counterfeit or authentic Cisco products;

2.  Using any logo, trade name, or trademark confusingly similar to any of the CISCO Marks which may be calculated to falsely represent or which has the effect of falsely representing that the services or products of any or all of the Restrained Parties or others are sponsored by, authorized by, or in any way associated with Cisco;

3.  Infringing any of the CISCO Marks;

4.  Otherwise unfairly competing with Cisco in the manufacture, sale, offering for sale, distribution, advertisement, or any other use of Cisco products;

5.  Falsely representing Wolon as being connected with Cisco or sponsored by or associated with Cisco or engaging in any act which is likely to cause the trade, retailers, and/or members of the purchasing public to believe that any or all of the Restrained Parties are associated with Cisco;

6.  Using any reproduction, counterfeit, copy, or colorable imitation of any of the CISCO Marks in connection with the publicity, promotion, sale, or advertising of counterfeit Cisco products;

7.  Affixing, applying, annexing, or using in connection with the sale of any goods, a false description or representation including words or other symbols tending to falsely describe or represent such goods as being Cisco products and from offering such goods in commerce;

8.  Diluting any of the CISCO Marks;

9.  Removing from its premises, or discarding, destroying, transferring, or disposing in any manner any information, computer files, electronic files, business records (including but not limited to e-mail communications), or other documents relating

PROPOSED ORDER GRANTING PLAINTIFFS' *EX PARTE* MOTION FOR TRO

1    to Wolon's assets and operations or relating in any way to the purchase, sale,

2    manufacture, offer for sale, distribution, negotiation, importation, advertisement,

3    promotion, or receipt of any products purporting to be Cisco; and

4    10. Assisting, aiding, or abetting any other person or business entity in engaging in or

5    performing any of the activities referred to in subparagraphs (1) through (9) above.

6    **B.    Freezing Wolon's Assets**

7    Immediately upon receipt of this Order, Wolon shall be restrained from secreting any

8    assets, and from transferring or conveying any assets held by, for, or on account of any of the

9    Restrained Parties, and a full accounting of the restrained assets shall be provided to counsel for

10   Cisco within three business days of receipt of this Order.

11   1.    Immediately upon receipt of this Order, all assets and funds held by, for, or on

12   account of any of the Restrained Parties, or in an account owned or controlled by

13   any of the Restrained Parties, or in an account as to which any of the Restrained

14   Parties has signature authority, shall be frozen and restrained, and a full accounting

15   of the restrained assets shall be provided to counsel for Cisco within three business

16   days of receipt of this Order.

17   2.    Immediately upon receipt of this Order, any bank, brokerage house, financial

18   institution, credit card association, merchant account provider, escrow service,

19   savings and loan association, payment provider, payment processing service

20   provider, money transmission service, third-party processor, or other financial

21   institution (including, but not limited to, MasterCard, VISA, American Express,

22   Discover, PayPal, Inc., Alipay, Wish.com, Amazon Pay, WeChat Pay, and any

23   correspondent, issuing, or member bank or account) (collectively, "Payment

24   Services") holding any assets by, for, or on account of, or any balance, payable, or

25   receivable owed to or held on account of, any of the Restrained Parties, or in an

26   account as to which any of the Restrained Parties has signature authority, including

27   but not limited to China Construction Bank and CITIBANK N.A., shall locate all

28   accounts and funds, whether located inside or outside the United States, connected

to any Restrained Parties and be restrained from releasing such funds until further order of this Court, and within three business days of receipt of this Order shall provide to counsel for Cisco a full accounting of the restrained assets.

3. Immediately upon receipt of this Order, any eCommerce Website, retailer, wholesaler, fulfillment center, warehouse, or any business or individual that has any money, property, or inventory owned by, or receivable owed to, any Restrained Party shall hold such money, property, inventory, or receivable until further order of this Court, and shall within three business days of receipt of this Order provide to counsel for Cisco a full accounting of all money, property, inventory, and receivables being held.

**C.    eCommerce Websites**

Immediately upon receipt of this Order, any Internet store or online marketplace platform, including, but not limited to, iOffer, eBay, AliExpress, Alibaba, Amazon, Wish.com, Facebook, and Dhgate (collectively, "eCommerce Websites") shall disable and be restrained from providing any services or payment to any Restrained Party, currently or in the future, in relation to any Cisco-marked product and/or product advertised using the CISCO Marks, including fulfillment of any pending orders; transfer to Cisco's control any seller identifications (including, but not limited to, the seller identifications identified in Exhibit A to the Decl. of Third Witness, ECF __) associated with any of the Restrained Parties' advertisement, offer for sale, or sale of Cisco-marked products and/or using the CISCO Marks, pending final hearing and determination of this action; disable and be restrained from displaying any advertisements used by or associated with any Restrained Party in connection with the advertisement, offer for sale, or sale of Cisco-marked products or otherwise using the CISCO Marks; disable access to any Restrained Party from any platform (including, but not limited to, direct, group, seller product management, vendor product management, and brand registry platforms) of any listings and associated images of Cisco-marked products or otherwise using the CISCO Marks (including, but not limited to, any listings and associated images identified by the "parent" or "child" Amazon Standard Identification Numbers ("ASIN"), and any other listings and images of products associated with any "parent" or "child"

1   ASIN linked to any Restrained Party or linked to any other alias of a Restrained Party being used
2   or controlled to offer for sale products using the CISCO Marks); remove links to any online
3   marketplace accounts on which Wolon advertises, offers for sale, or sells Cisco-marked products
4   and/or products advertised using the CISCO Marks; take all steps necessary to prevent links to
5   Wolon's online marketplace accounts from displaying any Cisco-marked product and/or product
6   advertised using the CISCO Marks in search results; and within three business days of receipt of
7   this Order provide to counsel for Cisco a statement certifying compliance with the requirements of
8   this paragraph.

9       **D.    Domain Names**

10      Immediately upon receipt of this Order:

11          1.  Any registrar for any domain names owned, operated, or controlled by, or
12              otherwise associated with, any Restrained Party (including, but not limited to,
13              wolonte.com) (collectively, Domain Names"), shall disable and be restrained from
14              providing any services to any Restrained Party, currently or in the future, in relation
15              to any Cisco-marked product and/or product advertised using the CISCO Marks;
16              deposit with a registrar of Cisco's choosing the domain certificates of any domain
17              names owned, operated, or controlled by, or otherwise associated with, any
18              Restrained Party pending final hearing and determination of this action; be
19              restrained from transferring use and control of any of the Domain Names to any
20              individual or entity other than a registrar of Cisco's choosing; take all steps
21              necessary to prevent Wolon from displaying any Cisco-marked product and/or
22              product advertised using the CISCO Marks on any domain name in the registrar's
23              possession, custody, or control; and within three business days of receipt of this
24              Order provide to counsel for Cisco a statement certifying compliance with the
25              requirements of this paragraph.

26          2.  The Restrained Parties shall be restrained from modifying control of or transferring
27              use and control of any of the Domain Names.

28

### E. Internet Search Engines

Immediately upon receipt of this Order, any Internet search engine, web host, sponsored search engine, or ad-word provider (including, but not limited to Google, Bing, Baidu, and Yahoo) (collectively, "Internet Search Engines") shall deindex, delist, or otherwise remove from its index and search results any URL owned, controlled, or otherwise associated with any Restrained Party's advertisement, offer for sale, or sale of Cisco-marked products and/or products advertised using the CISCO Marks (including, but not limited to, the URLs identified in Exhibit A to the Decl. of Third Witness, ECF __); disable and be restrained from providing any services to any Restrained Party, currently or in the future, in relation to the advertisement, offer for sale, or sale of Cisco-marked products and/or products advertised using the CISCO Marks; disable and be restrained from displaying any advertisements used by or associated with any Restrained Party in connection with the advertisement, offer for sale, or sale of Cisco-marked products and/or otherwise using the CISCO Marks; remove links to any of Wolon's online marketplace accounts owned, operated, or controlled by, or otherwise associated with, any Restrained Party in connection with the advertisement, offer for sale, or sale of Cisco-marked products and/or products advertised using the CISCO Marks (including, but not limited to, the URLs identified in Exhibit A to the Decl. of Third Witness, ECF __); take all steps necessary to prevent links to Wolon's online marketplace accounts from displaying any Cisco-marked product and/or product advertised using the CISCO Marks in search results; and within three business days of receipt of this Order provide to counsel for Cisco a statement certifying compliance with the requirements of this paragraph.

### F. Common Carriers

Immediately upon receipt of this Order, any person or company that transports or provides transportation services (including, but not limited to, United Parcel Service a/k/a UPS, FedEx, and DHL) (collectively, "Common Carriers") shall be restrained from fulfilling any shipments, accepting any shipments, or otherwise providing any services to any of the Restrained Parties, and within three business days of receipt of this Order shall provide to counsel for Cisco a statement certifying compliance with the requirements of this paragraph.

**G. Sequestration and Inspection of Cisco-Marked Products and Products Advertised Using the CISCO Marks**

Immediately upon receipt of this Order:

1. The Restrained Parties shall sequester and deliver to counsel for Cisco all Cisco-marked products and/or products advertised using the CISCO Marks in their inventory, possession, custody, or control to be examined and held by Cisco until further order of this Court.

2. Any eCommerce Website (as defined above) or Common Carrier shall sequester and deliver to counsel for Cisco all Cisco-marked products and/or products advertised using the CISCO Marks offered for sale by any Restrained Party that are in its possession, custody, or control to be examined and held by Cisco until further order of this Court.

**H. Order to Show Cause Re: Preliminary Injunction and Expedited Discovery**

Show Cause Hearing. Defendants Wuhan Wolon Communication Technology Co., Ltd. and Wuhan Wolon Cloud Network Communication Technology Co., Ltd.'s (together, "Wolon") are hereby ordered to show cause before this Court on **July 1, 2021** at 9:00 o'clock a.m., why a preliminary injunction, pursuant to Rule 65 of the Federal Rules of Civil Procedure, should not be issued enjoining Wolon and its principals, agents, officers, directors, members, servants, employees, successors, assigns, and all other persons in concert and participation with it, pending the final hearing and determination of this action from:

1. Purchasing, selling, distributing, marketing, manufacturing, or otherwise using any of the CISCO Marks (as defined herein) on any counterfeit or authentic product, or any marks confusingly similar thereto in connection with any Cisco products or other products. The "CISCO Marks" are:

- "CISCO" (U.S. Trademark Reg. Nos. 1,542,339; 2,498,746; 3,709,076; 3,978,294; 3,985,844; 3,990,147; 4,005,670)

- ‎ı١ıı١ı‎ CISCO (U.S. Trademark Reg. No. 3,759,451)

PROPOSED ORDER GRANTING PLAINTIFFS' *EX PARTE* MOTION FOR TRO

2. Using any logo, trade name, or trademark confusingly similar to any of the CISCO Marks which may be calculated to falsely represent or which has the effect of falsely representing that the services or products of Wolon or of others are sponsored by, authorized by, or in any way associated with Cisco;

3. Infringing any of the CISCO Marks;

4. Otherwise unfairly competing with Cisco in the manufacture, sale, offering for sale, distribution, advertisement, or any other use of Cisco products;

5. Falsely representing Wolon as being connected with Cisco or sponsored by or associated with Cisco or engaging in any act which is likely to cause the trade, retailers, and/or members of the purchasing public to believe that Wolon is associated with Cisco;

6. Using any reproduction, counterfeit, copy, or colorable imitation of any of the CISCO Marks in connection with the publicity, promotion, sale, or advertising of counterfeit Cisco products;

7. Affixing, applying, annexing, or using in connection with the sale of any goods, a false description or representation including words or other symbols tending to falsely describe or represent such goods as being Cisco products and from offering such goods in commerce;

8. Diluting any of the CISCO Marks;

9. Removing from its premises, or discarding, destroying, transferring, or disposing in any manner any information, computer files, electronic files, business records (including but not limited to e-mail communications), or other documents relating to Wolon's assets and operations or relating in any way to the purchase, sale, manufacture, offer for sale, distribution, negotiation, importation, advertisement, promotion, or receipt of any products purporting to be Cisco; and

10. Assisting, aiding, or abetting any other person or business entity in engaging in or performing any of the activities referred to in subparagraphs (1) through (11) above.

Wolon's failure to attend the show cause hearing scheduled herein shall result in the immediate issuance and confirmation of the preliminary injunction, and failure of Wolon to respond to this Order by **June 29, 2021**, shall result in the automatic issuance of a preliminary injunction, which shall be deemed to take effect immediately and shall extend during the pendency of this action. The Restrained Parties shall be deemed to have actual notice of the issuance and terms of such preliminary injunction, and that any act by any of the Restrained Parties in violation of any of its terms may be considered and prosecuted as contempt of this Court.

## I. Expedited Discovery

### 1. Wolon

Within three business days of receipt of this Order, the Restrained Parties shall produce to Cisco a summary document showing the dates, quantities, names, addresses, and other contact information, including any and all associated email addresses, of all suppliers and customers for the preceding twenty-four months from whom they have purchased or to whom they have sold any products using the CISCO Marks.

### 2. Third Parties

Within three business days of receipt of this Order, any Payment Service, eCommerce Website, Internet Search Engine, Common Carrier, or any other non-party that has information about the Restrained Parties shall produce to Cisco expedited discovery, including copies of all documents and records in such person's or entity's possession, custody, or control relating or referring to:

1. the names, addresses, and other contact information, including any and all associated email addresses, of any of the Restrained Parties;

2. the nature of any of Wolon's operations (including, but not limited to, identifying information associated with any Internet stores or online marketplace accounts), methods of payment, transportation, and listing history concerning the advertisement, offer for sale, or sale of Cisco-marked products and/or products advertised using the CISCO Marks;

PROPOSED ORDER GRANTING PLAINTIFFS' *EX PARTE* MOTION FOR TRO

3. any online marketplace accounts registered by Wolon, along with the true identities and contact information of the registrants of each online marketplace account to the extent the privacy protection service for any of Wolon's Internet stores, seller identifications, online marketplace accounts, commercial Internet websites, store URLs, and email addresses has concealed the registrant's identity and contact information;

4. any financial accounts owned or controlled by any of the Restrained Parties, including such accounts residing with or under the control of any Payment Service (as defined above);

5. the names and electronic and physical addresses of every owner and employee of each of the Restrained Parties; and

6. any other documents concerning or relating to any of the Restrained Parties.

**J.      Alternative Service of Process**

Service of the Summons and Complaint and of this Order, together with copies of the papers in support thereof, shall be made within fifteen (15) court days of the undersigned date on Wolon by delivering true copies thereof by email to sales01@wolonte.com, and that such service be deemed sufficient service.

**K.      Order Under Temporary Seal**

Pursuant to the terms of the "Sealing Order" separately entered in this matter, this Order is temporarily sealed in its entirety for fifteen (15) court days following the entry of this Order, except that Cisco is granted leave to serve this Order on third-parties, which Cisco deem reasonably necessary to effectuate the terms of this Order (*e.g.*, Payment Services, eCommerce Websites, Internet Search Engines, Common Carriers, etc.), and such third parties are hereby ordered to keep this Order confidential and not disseminate this Order outside of those persons within their organizations reasonable necessary to comply with this Order until the earlier of: (1) this Order becomes public; or (2) the expiration of fifteen (15) court following the entry of this Order.

PROPOSED ORDER GRANTING PLAINTIFFS' *EX PARTE* MOTION FOR TRO

1       IT IS SO ORDERED.

2

3

4 DATED:   June 7   , 2021                 _____

                                            United States District Judge

PROPOSED ORDER GRANTING PLAINTIFFS' *EX PARTE* MOTION FOR TRO